UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | :     Case No. 22-cr-089-ZMF |
| v. | : |
| | : |
| NANCY BARRON, | : |
| | : |
|         Defendant | : |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Nancy Barron to 12 months' incarceration followed by 1 year of supervised release. The government also requests that this Court impose 60 hours of community service and $500 in restitution.

**I.      Introduction**

Defendant Nancy Barron, a 47-year-old unemployed former member of the Army National Guard, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

1

Barron was convicted at trial of violations of 18 U.S.C. § 1752(a)(1) (entering or remaining in a restricted building or grounds); 18 U.S.C. § 1752(a)(2) (disruptive or disorderly conduct in a restricted building or grounds); 40 U.S.C. § 5104(e)(2)(D) (disorderly conduct in a Capitol building); and 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating, or picketing in a Capitol building). The government's recommendation is supported by Barron's conduct at the Capitol on January 6, 2021, including: (1) the repeated instances in which she pushed past police lines; (2) her effusive cheering of rioters as they inflicted violence upon police officers; and (3) Barron's failure to accept responsibility for her actions on January 6, and her utter lack of remorse.

The Court must consider that the Barron's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for her actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Barron's crime—and her continued lack of cooperation—support a sentence of 12 months incarceration in this case.

**II.    Factual and Procedural Background**

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 01-1 Statement of Facts, p. 1.

*Defendant Barron's Role in the January 6, 2021 Attack on the Capitol*

Nancy Barron travelled to Washington D.C. on January 6, 2021 to attend a rally being held by her preferred candidate for president after the 2020 Presidential Election. As Barron explained

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

at trial, she drove all night and arrived in the District around 2:00 a.m. Her arrival caused her to oversleep and miss her preferred candidate's speech completely. Having the reason for her trip nullified, she instead walked directly to the United States Capitol.

Barron approached a bicycle rack barrier on the north side of the East Front of the United States Capitol at 1:55 p.m. Govt. Tr. Ex. 202.



*Figure 1: Government's Trial Exhibit 202, yellow circle added*

Although Barron travelled to Capitol building alone, she quickly joined her fellow rioters stopped at that bicycle rack until they pulled it aside at 1:58 p.m. Govt. Tr. Ex. 201. Once pulled aside, Barron led the crowd toward the East Rotunda Door.



*Figure 2: Government's Trial Exhibit 216 at 0:07 seconds. Yellow circled added for clarity.*

On that day, Barron wore a green jacket and a black hat with the letters "MAGA" across the front. During her trek from the line of bicycle racks to the East Rotunda Door, Barron pumped her fist, and walked alongside a flag that read, "FUCK BIDEN." Once she arrived at the steps, she again was met by a line of United States Capitol Police officers.



*Figure 3: Government's Trial Exhibit 216 at 3:46*

Barron joined the mob in pushing past this line.

Barron made it to the closed East Rotunda Door, and again confronted officers attempting to desperately keep the rioters out of the building. During this standoff, Barron recorded as other rioters beat, sprayed, and pushed against officers struggling to keep the door closed. At trial, Officer M.C. testified that at this moment he believed that he was going to die. But during this confrontation, Barron yelled, "Go in! Go in! Go in! Charge! Charge! Charge!" Gov. Tr. Ex. 218 and 402.

Barron pushed her way into the Capitol, and with a plainly jubilant expression, she recorded herself stating, "Made it in." But her crimes continued.



*Figure 4: Barron was jubilant after entering the Capitol, as seen in Gov Ex 403 at 0:04.*

Barron chanted, pushed over a sign, and smoked while inside the Capitol. She entered the building at approximately 2:39 p.m., and finally left at approximately 3:04 p.m. But in these 25 minutes, Barron encouraged others to delve deeper into the House Chamber. At approximately 2:43, Barron joined a group of rioters outside the door to the House Chamber. Barron yelled, "Our

House," "Fuck the Tyrants," and explained to another rioter, "We can get in, if you push strong enough, you're going to get it." *See* Gov. Tr. Ex. 403. But instead of pushing at that door, Barron moved east toward a different entrance into the Chamber.

As Barron moved toward that other entrance, she came across the stairwell to the third floor. At the foot of those stairs Barron yelled, "Fuck Nancy Pelosi, and Fuck Chuck Schumer! We gotta drag them cocksuckers down!" *See* Gov. Tr. Ex. 403. Barron continued upstairs and headed back toward the center of the building.

Barron then made her way through the third-floor halls, grabbed a door-hang representing that a room had been cleared, and made her way back down to the vestibule outside the East Rotunda Door. Barron stood near the exit, but only exited after she smoked two cigarettes.

*The Charges*

On March 17, 2022, the United States charged Barron by a four count Information with violation 18 U.S.C. § 1752(a)(1) (Entering or Remaining in a Restricted Building or Grounds), 18 U.S.C. § 1752(a)(2) (Disorderly or Disruptive Conduct in a Restricted Building or Grounds), 40 U.S.C. § 5104(e)(2)(D) (Disorderly or Disruptive Conduct in a Capitol Building, and 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building). On August 29, 2023, Barron was convicted of each offense by jury.

### III.   Statutory Penalties

Barron now faces sentencing for violating these four misdemeanor offenses. The violations of 18 U.S.C. § 1752 require a guideline calculation. The violations of 40 U.S.C. § 5104(e)(2) are Class B misdemeanors, and the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9. This Court has discretion to sentence each four concurrently.

**IV.     The Sentencing Guidelines and Guidelines Analysis**

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. The probation officer groups count one and two together and provides the calculation for the violation of 18 U.S.C. § 1752(a)(2) as the controlling guideline range for the group.

**Count 2, Disorderly and Disruptive Conduct in a Restricted Building or Grounds**

Base Offense Level (U.S.S.G. §2A2.4)           +10
Acceptance of Responsibility (U.S.S.G. §3R1.1)   - 0
Total Adjusted Offense Level                   10

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria, Section 4C1.1 does not apply in this case. The PSR correctly identifies that Barron should receive at least 1 point for her 2013 conviction of Operating a Vehicle Under the Influence of Alcohol or Drugs.

The U.S. Probation Office calculated Barron's criminal history as a category I. PSR at ¶ 46. Accordingly, the U.S. Probation Office calculated Barron's total adjusted offense level at 10,

7

and her corresponding Guidelines imprisonment range at 6 to 12 months. PSR at ¶¶ 87. The government agrees with that score.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

V. **Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of twelve months incarceration followed by supervised release.

A. **The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Barron's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Barron, the absence

8

of violent or destructive acts is not a mitigating factor. Had Barron engaged in such conduct, she would have faced additional criminal charges.

One of the most important factors in Barron's case is the need for the sentence imposed to afford adequate deterrence to criminal conduct and to promote respect for the law. On January 6, Barron was determined to enter the Capitol while it was under siege. Each barrier that Barron came upon was one that she pushed past. Each was an escalation. Barron first pushed past a bicycle rack. Next, she pushed past a line of police officers who were overwhelmed by rioters. She repeatedly disregarded the struggles of police officers were being beaten and sprayed. Encountering a locked door that was clearly broken open, Barron continued her push into the Capitol.

Barron refuses to accept responsibility for her actions and continues to be uncooperative. Most recently, Barron has refused to provide basic personal information to the United States Probation Officer that is needed by this Court. She refuses to provide basic information to Probation because she does not appear to respect this Court or this criminal process:

- PSR at ¶ 68, the officer notes: "she has not returned the release forms; therefore, the medical history is unverified."
- PSR at ¶ 70, the officer notes: "The defendant elected not to provide COVID information on the advice of her attorney."
- PSR at ¶ 73, the officer notes: "The defendant declined to provide substance use information on the advice of her attorney."
- PSR at ¶ 77, the officer notes: "The defendant did not provide a reason for the end of this employment."
- PSR at ¶ 78, the officer notes: "She did not provide a reason for this employment ending."

- PSR at ¶ 81, the officer notes: "To date, she has not returned the [Net Worth] forms to our office."

- PSR at ¶ 82, the officer notes: "Accurint records indicate the defendant may have the following assets, which were not reported during the presentence interview."

- PSR at ¶ 84, the officer notes: "Based on the limited financial information provided, the probation office was unable to determine whether the defendant has the ability to pay a fine."

§3C1.1 would increase Barron's guideline range, "If (1) the defendant willfully obstructed or impeded . . . the administration of justice with respect to the . . . sentencing of the instance offense of conviction . . .." U.S.S.G. §3C1.1 (2023). But Application Note 5 provides, "Some types of conduct ordinarily do not warrant application of this adjustment . . . (C) providing incomplete or misleading information, not amounting to a material falsehood, in respect to a presentence investigation." U.S.S.G. §3C1.1, n. 5(C). But this type of conduct, "may warrant a greater sentence within the otherwise applicable guideline range or affect the determination of whether other guideline adjustments apply." U.S.S.G. §3C1.1, n.5.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration—greater within the otherwise applicable guideline range—in this matter.

### B. Barron's History and Characteristics

As set forth in the PSR, Barron's criminal history consists of a misdemeanor conviction for Operating a Vehicle while Impaired (Alcohol and/or Drugs) and an unscored assault conviction from 2003. As provided by the PSR, Barron caused serious physical harm to her victim by kicking, striking, and wrestling with her. PSR at ¶ 44.

A further criminal conduct event was cataloged in the PSR at ¶ 48. The PSR notes, "The circumstances for this case are not available." PSR at ¶ 48. The government requested further information from the local court and learned there was no admission of guilt on the record related to the charge. U.S.S.G. §4A1.2(f).

Barron reported that she enlisted in the Army National Guard in 2008 and served until 2014. Barron advised that she received an honorable discharge, but the PSR writer was unable to verify this information due to Barron's refusal to provide information.

While Barron's military service is laudable, it renders her conduct on January 6 all the more troubling. As a former military member, Barron was well aware of the ideals our nation holds dear. Her voluntary decision to storm a guarded government building is disturbing in light of her former military service and training.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider. There was nothing that stopped Barron on January 6, 2021, from "pushing strong enough" and entering the Capitol.

*Specific Deterrence*

Barron's role in the riot on January 6 requires she be held responsible for her own actions. And her actions occurred at a time when it was painfully obvious she was not allowed into the Capitol. Each barrier she crossed did not deter her. Barron was clearly jubilant on January 6, and proud of her intrusion into the Capitol. Since January 6, Barron has expressed no remorse for her actions; she remains proud of her actions on January 6. The need for specific deterrence is clear: the only thing that will stop her, for a time, will be the full incarceration authorized by law for the offenses she committed.

As discussed above, Barron still is unwilling to provide this Court with information it requires to impose a sentence. Barron's conviction, and the speed with which the jury returned its

verdict, have not caused her to respect the legal process. Instead, she in some respects has been emboldened.

A greater sentence within the otherwise applicable guideline range is required to specifically deter Barron from further engaging in the next violent attack on government in pursuit of her political goals, or at the very least, deter her uncooperative conduct when she is convicted again.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[2] This Court must sentence Barron based on her own conduct and relevant characteristics, but should give substantial weight to the context of her unlawful conduct: her participation in the January 6 riot.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017). Consequently,

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden). If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v Russell Alford*, 21-cr-263-TSC, the defendant was sentenced to 12 months of incarceration followed by 12 months of supervised released. Much like the present case, in *Alford* the defendant walked past the violence that was occurring in an attempt to get deeper into the Capitol. Much like the present case, in *Alford* the defendant showed no remorse for his actions. Unlike the present case, in *Alford* the defendant had a criminal history score of zero. Alford was 62 years old at the time of sentencing; Barron is 47. In *Alford*, the sentencing court also added two levels for obstruction, due to the defendant's misleading—under oath—testimony. But in comparison to Barron, Alford's conduct was tamer than Barron's. Alford cooperated during the presentence investigation.

In *United States v Jesus Rivera*, 21-cr-60-CKK, the defendant was also convicted of four misdemeanor offenses. Rivera also moved through the Capitol and recorded his actions. Rivera was in the Capitol for approximately 20 minutes. Much like Barron's comment about Nancy Pelosi and Chuck Schumer, Rivera yelled to fellow rioters, "this would be a real revolution . . . if we go in and pull their asses out of there!" Unlike Barron, Rivera did not have a criminal history. Without the added two levels for obstruction like in *Alford*, Rivera's guideline range was 6 to 12 months like in the present case. The defendant in *Rivera* was sentenced to 8 months incarceration followed by 12 months supervised release, but the defendant in *Rivera* also cooperated with the presentence investigation.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

VI. **Restitution**

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary

15

authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[3] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The

---

[3] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

16

MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Barron was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[4]

---

[4] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

17

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and her criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for her individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."). *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Barron to pay $500 in restitution for her convictions. This amount fairly reflects Barron's role in the offense and the damages resulting from her conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, five hundred dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was convicted of only misdemeanors and not directly and personally involved in damaging property.

18

Accordingly, such a restitution order avoids sentencing disparity.

## VII. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Barron to 12 months incarceration followed by supervised release. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Barron's liberty as a consequence of her behavior.

Respectfully Submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By: /s/ *Adam M. Dreher*
ADAM M. DREHER
Assistant United States Attorney
Michigan Bar No. P79246
601 D. St. N.W.
Washington, D.C. 20530
(202) 252-1706
adam.dreher@usdoj.gov

VICTORIA A. SHEETS
Assistant United States Attorney
New York Bar No. 5548623
victoria.sheets@usdoj.gov